**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)**

| | |
|---|---|
| In re:<br><br>GEORGETOWN GOLF CLUB, INC., <u>et al</u>.,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-18710<br><br>**Joint Administration Pending** |

**EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
FINANCING AND TO USE CASH COLLATERAL**

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), by and through their undersigned counsel, hereby file this motion (the "<u>Motion</u>") for entry of an order: (a) authorizing the Debtors to obtain postpetition financing pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code (as defined below) and to utilize cash collateral pursuant to section 363 of the Bankruptcy Code; (b) granting adequate protection to Sovereign Bank, the prepetition secured party, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code; and (c) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts ("<u>MLBR</u>" or the "<u>Local Rules</u>").

In support of this motion (the "<u>Motion</u>"), the Debtors respectfully state as follows:

### JURISDICTION

1.  The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are §§ 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "**Bankruptcy Code**").

## BACKGROUND

A. **The Debtors' Bankruptcy Cases.**

3. On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.

4. Simultaneous with the filing of this pleading, the Debtors have filed a motion with this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure seeking joint administration of the Debtors' estates and the Chapter 11 Cases.

5. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

B. **Events Leading to Bankruptcy.**

6. Beginning in approximately early Spring, 2009, the Debtors began experiencing liquidity problems. Key factors which impact the Debtors' operations lie beyond their control including, among other things, the weather and the economy. Indeed, the Debtors' operations, and revenue-generating period, are generally limited to approximately six months each year. Accordingly, as a result of, among other things, the poor economy, the nature of its business, and the inclement weather, the Debtors began running behind on its payments to some of its creditors.

7. The Debtors believe that they will be able to improve their cash flow and operations by, among other things, rejecting several agreements which are unprofitable. Moreover, the Debtors believe that their bankruptcy cases likely will preserve the value of the Georgetown Golf Club by allowing them, *inter alia*, to market their business enterprise on a going-concern basis.

**C.    Prepetition Secured Debt.**

8. As of the Petition Date, the Debtors collectively owe approximately $10 million to their creditors. The Debtors dispute several of the claims asserted against them, including, without limitation, liability arising on account of membership deposits.

9. The Debtors' senior secured lender is Sovereign, which holds a mortgage interest on the GGC's interest in the Golf Course and a security interest and lien on substantially all of the Debtors' assets. The Debtors' obligations to Sovereign are as follows:

|  | Term Note | Revolving Term Note | Total |
|---|---|---|---|
| Principal | $4,313,848.68 | $240,000.00 | $4,553,848.68 |
| Interest | $52,212.99 | $4,675.00 | $56,887.99 |
| Late Fees |  | $216.73 | $216.73 |
| Total | $4,366,061.67 | $244,891.73 | $4,610,953.40 |
| *Per Diem* | *$753.28* | *$28.33* | *$781.61* |

10. In addition to Sovereign's secured claims against the Debtors, Membership Realty Trust III, holder of a second mortgage, is owed approximately $2,150,000 by GGC.

11. On information and belief, the only other creditor holding a mortgage interest in the Golf Course is Sherin & Lodgen LLP ("**S&L**"). On information and belief, S&L's claim is approximately $312,000.

**RELIEF REQUESTED**

12. By this Motion, the Debtors seek the authority: (a) to use Sovereign's cash collateral to finance their business operations and (b) to enter into a DIP financing facility up to $191,000.00 (the "DIP Facility"), which shall allow the Debtors immediately to borrow funds from Sovereign, if necessary, in connection with the maintenance of their businesses pending the proposed sale of the

3

Debtors' assets. A true and correct copy of the Debtor in Possession Credit and Security Agreement (the "DIP Credit Agreement") is attached hereto as **Exhibit A**. The DIP Facility shall be subject to the same terms and conditions of the Loan Documents, shall bear the interest rate of prime rate plus 4.00% per annum. Each of the Debtors shall be jointly and severally liable for the obligations arising under or in connection with the DIP Facility.

13. Because the Debtors shall pursue a sale of all or substantially all of its assets as a going-concern as soon as practicable, the Debtors do not anticipate the need for long-term financing. Moreover, the Debtors expect to generate sufficient working capital from the collection of account receivables, sale of existing inventory, and other business operations such that cash collateral funds, along with the DIP Facility (if necessary), should be sufficient to pay all administrative expenses due and payable during the periods covered by the budget, a copy of which is attached hereto as **Exhibit B** (the "Budget"). The Debtors shall be permitted to request advances from the DIP Facility, and if no default first occurring postpetition exists at such time, Sovereign shall make advances pursuant to such requests, which advances in a particular week shall be in an amount equal to the amount set forth in the Budget, subject to certain variances.

14. The proceeds of the DIP Facility will be used by the Debtors to fund their working capital and general corporate needs during the administration of these cases prior to October 10, 2009, the date through which Sovereign has committed to finance the Debtors' ongoing operations (the "Projection Period"). Because budgeted expenses are based upon projections and actual expenses may vary from projected amounts, the Debtors respectfully request, and Sovereign has agreed, that they be authorized to pay any such actual expenses so long as they do not vary substantially from the projections, as more fully set forth in the proposed order authorizing use of cash collateral and financing on an interim basis, attached hereto as **Exhibit C** (the "Interim Order").

15. As collateral for the DIP Facility, Sovereign shall be granted a senior lien and security interest, pursuant to 11 U.S.C. §§ 364(c) and (d), in all prepetition and postpetition assets of

4

the Debtors, including, without limitation, the Collateral and all of the Debtors' accounts receivable, but excluding all avoidance actions arising under 11 U.S.C. §§542 – 553.

**BASIS FOR RELIEF**

    A.    <u>Use of Cash Collateral</u>

        *1.*    *Definition of Cash Collateral*

16.    Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits property … subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

17.    Section 552(b) of the Bankruptcy Code provides:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, then such security interest extends to such proceeds, products, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to the extent the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b).

18.    In view of the foregoing, the term "cash collateral" in this case includes the revenues and the proceeds of accounts receivable as well as post-petition revenues (collectively, "<u>Cash Collateral</u>").

19.    In order to effectuate a liquidating plan of reorganization premised on the going-concern sale of the Debtors' business, the Debtors require the use of revenue and accounts receivable proceeds, which constitutes cash collateral of Sovereign.

        *2.*    *The Debtor's Request To Use Cash Collateral*

5

20. Section 363(c)(2) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "may not use, sell or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents; or (B) the Court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

21. Sovereign is owed over $4,600,000 under the Loan Agreements and holds a security interest in all of the Debtors' real and personal property, cash, accounts receivable and inventory. The Debtors seek court authority to use Sovereign's cash collateral to promote the sale of all or substantially all of the Debtors' assets as a going-concern, which the Debtors submit are in the best interests of its creditors and its members.

22. In addition, the Debtors' need for Cash Collateral is critical. If the Debtors are not authorized to use Cash Collateral on the conditions set forth herein, the Debtors will be forced to terminate or suspend operations, and the value of the Debtors' business, including its current contracts and related goodwill, including any going-concern value, likely will be zero. Furthermore, if the Debtors are not authorized to use Cash Collateral as set forth herein, Sovereign will be forced to liquidate the remaining assets of the Debtor. In such an event, Sovereign would only recover the "liquidation" value of the Debtors' assets, and creditors other than Sovereign might receive little or no recovery.

23. If the Debtors are granted authority to use Cash Collateral in accordance with the terms set forth herein and in the attached Budget, they will be able to maintain their business operations and preserve the existing value of their enterprises for the benefit of Sovereign, all of their creditors, their employees and their members.

24. Accordingly, the Debtors respectfully request that this Court authorize and approve the Debtors' use of Cash Collateral for the Projection Period as set forth in the Budget. Sovereign consents to the Debtors' use of the Cash Collateral, subject to the terms set forth in the Interim Order.

25. In light of the foregoing, it is clearly in the best interests of the Debtors, their creditors and their estates that the Debtors continue to operate their businesses and pay all postpetition obligations to fully maintain their businesses and to satisfy all administrative expenses, pending confirmation of a chapter 11 plan of liquidation. Absent the use of Cash Collateral, the Debtors will be unable to operate and will suffer irreparable harm. Even a temporary interruption or discontinuance of the Debtors' ability to fund operational expenses and maintain services to their customers may make it impossible to conduct business on a postpetition basis or to reorganize the Debtors' financial affairs and maintain their going-concern value.

26. The Debtors therefore request that this Court approve the interim relief requested and schedule a final hearing, at which time the Debtors will seek final approval of this Motion, authorizing the continued use of Cash Collateral through and including October 10, 2009.

B.  **Authorization to Obtain DIP Financing**

1.  *Overview of DIP Loan*

27. The Debtors seek authority to incur the DIP Facility from Sovereign pursuant to the terms of the DIP Credit Agreement, to the extent necessary, to provide working capital for the Debtors' continued operations prior to the proposed sale. Among the primary terms of the DIP Credit Agreement and DIP Facility are the following:[1]

Purpose: To permit the Debtors to pay overhead costs, operating expenses, adequate protection, and administrative and professional fees in accordance with the Budget.

Interest: Prime rate plus 4.00% per annum based upon a 360 day year.

Maximum Outstanding Indebtedness: $191,000.00.

Funding Period End: October 10, 2009

---

[1] The following synopsis is provided for informational purposes only and serves only as a general description of the key terms of the DIP Credit Agreement. The terms of the DIP Credit Agreement and/or the Interim Order shall control in the event that the terms thereof are inconsistent with the discussion provided herein.

7

<u>Security</u>: Security for the DIP Facility will consist of a senior lien and senior security interest in all of the Debtors' assets, excluding avoidance actions arising under chapter 5 of the Bankruptcy Code. The liens and security interests shall prime and be senior to all other liens and security interests with the exception of: Permitted Prior Liens, the Carve Out, the Final Payroll Right.

<u>Fees</u>: $5,000.00, to be included in the balance of the Maximum Outstanding Indebtedness.

<u>Restrictions on Payments</u>: Payments shall be made solely for the purposes described in the Budget and in the amounts set forth in the Budget (subject to the Variance).

<u>Loan Funding</u>: Funding of the DIP Loan shall commence upon the entry of the interim or final order of the Bankruptcy Court approving the DIP Loan.

<u>Voluntary Prepayments</u>: Permitted in whole or in part, without premium or penalty.

<u>Carve Out</u>: Sovereign has consented to except from the scope of its liens and interests a maximum amount of $80,000 to satisfy the fees and expenses of the Debtors' professionals Duane Morris LLP and Geary Vaughan LLC, as more fully set forth in the Interim Order.

28. The terms of the DIP Credit Agreement have been negotiated in good faith and at arm's length, and reflect the Debtors' exercise of their business judgment. ***Certain of the terms contained in the Interim Order and the DIP Credit Agreement vary from MLBR 4001-2(c). Such terms are conspicuously highlighted in bold in the Interim Order.***

29. Prior to agreeing to the DIP Credit Agreement, the Debtors sought financing from other sources, including, among other sources, potential purchasers of the Debtors' assets. The Debtors were unable to obtain financing on terms better than those provided by Sovereign. Under the circumstances, the Debtors submit it would not be possible for them to obtain credit on terms more favorable than those contemplated to be provided by Sovereign pursuant to the DIP Credit Agreement and the Interim Order. The Debtors have no alternative source of financing to meet their funding needs, and require the DIP Facility in the event that their working capital does not generate sufficient positive cash flow. Without the DIP Facility, the Debtors have concerns regarding their continued operations, fearing that serious and irreparable harm to the Debtors and their estates would

8

result. The DIP Facility will therefore preserve, maintain and enhance the value of the Debtors' assets.

### 2. *The Interim Borrowing.*

30. The Debtors request that the Court authorize the Debtors to immediately borrow the amounts set forth in the Budget during the period from and after the Court allows interim relief on this Motion until the Court considers allowance of this Motion on a final basis (the "Interim Borrowing"). The Interim Borrowing, if necessary, would be used to fund operations, to maintain the going-concern value of the Debtors' businesses, and to prepare for the sale of substantially all of the Debtors' assets, all in accordance with the Budget.

### 3. *Request for Interim and Final Approval of the DIP Loan.*

31. Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority, and (d) obtain secured credit by granting a secured lien on property of the estate. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt repayment of which is entitled to super-priority administrative expense status or which is secured by liens on the debtor's property.

32. Generally, Sections 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of credit are not available under 364(a) or (b). See In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)("debtor is not required to seek credit from every possible source … [but only to] show that it has made a reasonable effort to seek other sources of credit available.")

33. Against this backdrop, a Court will evaluate the facts and circumstances of a debtor's case, and will grant significant weight to a debtor's business judgment regarding the necessity for obtaining the requested financing. Id. at 40.

9

34. The Debtors are unable to obtain financing either in the form of unsecured debt allowable under Section 503(b)(1) of the Bankruptcy Code, or as debt secured only by a junior lien on the Debtors' assets. In this case, the Debtors were able to secure financing only from their existing principal secured lender, subject to the grant of a postpetition liens as described herein

35. Given the nature of Sovereign's liens, no other lender is likely to satisfy Sovereign in exchange for first lien position ,or take junior liens, subject to Sovereign's senior liens

### C. Granting Sovereign Adequate Protection For Diminution In Value Of Collateral

36. The Debtors believe that the proposed sale of the Debtors' business as a going-concern will enhance, and not diminish, the value of Sovereign's collateral. Nevertheless, as a condition to Sovereign's consent to the use of the Cash Collateral and the extension of credit under the DIP Credit Agreement, and in light of Sovereign's current right to foreclose upon the collateral, the Debtors request that this Court grant Sovereign adequate protection, to preserve its interests in the event of diminution in the value of the collateral, by granting liens on all of the Debtors' assets (excluding the Debtors' bankruptcy causes of action arising under chapter 5 of the Bankruptcy Code). See In re Cumberland Farms, Inc., 162 B.R. 62 (Bankr. D. Mass. 1993) (holding that a postpetition decline in value of collateral must occur to warrant adequate protection); In re Mullen, 172, B.R. 473, 475 (Bankr. D. Mass. 1994); In re Ledgemere Land Corp., 125 B.R. 58, 61 (Bankr. D. Mass. 1991). Such liens shall be limited in scope to the extent of: (a) the diminution cased by the Debtors' use of the Cash Collateral, and (b) all outstanding amounts owed under or in connection with the DIP Credit Agreement as of the maturity date.

### NOTICE

37. No chapter 11 trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been served pursuant to MLBR 4001-2(b) upon the United States Trustee, each known local, state and federal taxing authority with a claim against the debtor, if any, secured creditors with an interest in the collateral, the Debtors' 20 largest creditors,

Sovereign, and any party who filed a request for service  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

### **NO PRIOR REQUEST**

38. No prior request for the relief sought in this Motion has been made to this or any other court.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

**WHEREFORE**, the Debtors respectfully request that the Court enter the Order, substantially in the form submitted herewith, (A) authorizing the Debtors to use Cash Collateral on the terms and conditions set forth in the DIP Credit Agreement and the Interim Order; (B) authorizing the Debtors to enter into the DIP Credit Agreement and to borrow up to $191,000 on the terms and conditions set forth in the DIP Credit Agreement and the Interim Order; (C) providing Sovereign with liens, claims and adequate protection consistent with the terms of the Interim Order; and (D) granting such other and further relief as the Court deems appropriate.

**GEORGETOWN GOLF CLUB, INC.**
**NEW ENGLAND GOLF PARTNERS, INC.**
**GEORGETOWN LINKS, LLC,**

By their proposed attorneys,

Dated: September 11, 2009        /s/ Kara M. Zaleskas
Paul D. Moore (BBO #353100)
pdmoore@duanemorris.com
Kara M. Zaleskas (BBO #651981)
kmzaleskas@duanemorris.com
Duane Morris LLP
470 Atlantic Avenue
Boston, MA 02210
(857) 488-4200