# EXHIBIT A

DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

Made and executed as of this 11th day of September, 2009, between Georgetown Golf Club, Inc. ("Georgetown Golf"), Georgetown Links, LLC ("Georgetown Links") and New England Golf Partners, Inc. ("New England"), debtors-in-possession in Case Nos. 09-_____, 09-_____ and 09-_____ (the "Cases") pending in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), all of which have a place of business at 258 Andover Street, Georgetown, Massachusetts 01833 (collectively, the "Debtors") and Sovereign Bank, with a place of business at 75 State Street Boston, Massachusetts 02109 ("Lender").

Recitals

(A) On September 11, 2009, (the "Petition Date"), Debtors commenced the Cases.

(B) Debtors are obligated to Lender on certain pre-Petition Date indebtedness and obligations (collectively, the "Pre-Petition Obligations") pursuant to: a certain Term Note in the stated amount of $5,200,000.00; Unlimited Guaranties of Georgetown Links and New England; Revolving Term Note in the stated amount of $250,000.00; Commercial Mortgage, Security Agreement and Assignment of Leases and Rents; Assignment of Interests in Licenses Permits and Agreements; Liquor License Pledge Agreement; and Loan and Security Agreement, all of the foregoing dated on or about December 31, 2001; and a certain Interest Rate Swap Agreement, dated August 31, 2005 and all ancillary documents, instruments and agreements executed therewith as they may have been amended from time to time thereafter. The Pre-Petition Obligations are personally guaranteed by Peter Wojtkun and Steven Guerrette pursuant to certain Limited Guaranties also dated December 31, 2001 of all Obligations (as defined in said Limited Guaranties) of Georgetown Golf, Georgetown Links and New England. Said Term Note, Unlimited Guaranties, Revolving Term Note, Commercial Mortgage, Security Agreement and Assignment of Leases and Rents, Assignment of Interests in Licenses Permits and Agreements, Liquor License Pledge Agreement, Loan and Security Agreement, Interest Rate Swap Agreement, Limited Guaranties and all such ancillary documents, instruments and agreements executed therewith as they may have been amended from time to time thereafter are hereinafter referred to as the "Pre-Petition Loan Agreements." As security for said Pre-Petition Obligations, Lender holds liens and security interests (the Pre-Petition Liens") in all of the Debtors' pre-Petition Date real and personal property Collateral as described in detail below, including Cash Collateral, (collectively, the "Pre-Petition Collateral").

(C) Debtors desire to use Lender's Cash Collateral and obtain Advances from Lender on the terms and conditions herein set forth in this Agreement and in the Financing Orders.

1

"Collateral" means:
(A) all of Debtors' real estate, fixtures and improvements thereon known as and referred to as 258 and 260 Andover Street and land off Baldpate Road, Georgetown, Essex County, Massachusetts and described in two deeds dated April 7, 1995 and July 20, 2001, respectively, and recorded with the Essex South District Registry of Deeds in Book 12983, Page 362 and Book 17440, page 51, respectively; and
(B) all of the Debtors' personal property, intangible property and non-real estate property, wherever located, whether now owned or hereafter created, acquired or arising, and all proceeds and products thereof, including, without limitation, the following:
(1) all Cash Collateral;
(2) all equipment (including machinery, equipment, furnishings, fixtures, vehicles, and embedded soft-ware);
(3) all inventory (including raw materials, work in process, finished goods, all repossessed goods arising from or relating to any accounts, and embedded software);
(4) all fixtures;
(5) all accounts;
(6) all chattel paper (whether tangible or electronic);
(7) all instruments (including promissory notes);
(8) all documents (including warehouse receipts, bills of lading, cargo receipts, and delivery orders, whether tangible or intangible);
(9) all deposit accounts (including checking, passbook, savings, money market, cash management and sweep accounts);
(10) all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing);
(11) all commercial tort claims;
(12) all investment property (including securities, security entitlements, and securities accounts);
(13) all general intangibles (including tax refunds, payment intangibles, patents, patent applications, trade-marks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, applications for service marks, customer lists, goodwill, and all licenses, permits, and agreements of any kind or nature pursuant to which Debtors possess, uses or has authority to possess or use tangible or in-tangible property of others);
(14) all supporting obligations;
(15) all substitutions and replacements for, accessions, attachments, and other additions to, and tools, parts, components, accessories and equipment used in connection with, any of the foregoing;
(16) all certificates of title and certificates of origin or manufacturers statements of origin relating to any of the foregoing; and
(17) all recorded data of any kind or nature, regardless of the medium of recording, including all writings, documents, books, records, ledger sheets, plans, specifications, schematics, files, computer programs, tapes, disks, and related electronic data processing software.

"Commitment" means the obligation hereunder of Lender to make Advances which in the aggregate do not exceed the Borrowing Limit.

"DIP Facility" means the line of credit established by this Agreement and the Interim Order and any Final Order.

"DIP Facility Account" means the account of Debtors on the books of Lender in which Lender shall record: (1) all Advances made by Lender to Debtors pursuant to this Agreement; (2) all interest, charges, expenses, and other items chargeable to Debtors pursuant to this Agreement; (3) payments made on such Advances by Debtor; and (4) other appropriate debits and credits as provided in this Agreement.

"DIP Obligations" is used in its most comprehensive sense and includes the DIP Facility Account and any and all other advances, Debt, obligations, covenants, undertakings and liabilities of any of the Debtors to Lender, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, liquidated or disputed, due or to be-come due, now existing or hereafter arising under this Agreement or any Financing Order, however evidenced, and whether or not same are from time to time reduced or extinguished and thereafter increased or re-incurred, and whether or not presently contemplated by the parties on the date of this Agreement, including all principal, interest, taxes, fees, charges, costs, and expenses (including reasonable attorneys' fees) chargeable to Debtors or incurred by Lender under this or any other agreement or instrument. The DIP Obligations do not include the Pre-Petition Obligations.

"Debt" means "debt" as defined in Bankruptcy Code section 101.

"Debtors" means Georgetown Golf, Georgetown Links and New England or any of them.

"DIP Liens" means the Liens granted hereunder and in any Interim Order and Final Order.

"DIP Loan Agreement" means this Agreement.

"Event of Default" means the occurrence of any one or more of the following:

(1) any Financing Order shall have been amended, rescinded, stayed, vacated, reversed, or modified in any respect; or
(2) the Court shall not have entered the Interim Order by September 15, 2009, the Interim Order shall not have become a Final Order (or, if the Final Order is a separate order, the Final Order shall not have been entered) within twenty (20) days after entry of the Interim Order, or any Final Order shall for any reason cease to be in full force and effect from and after the Court's entry thereof; or
(3) any statement, representation or warranty made by Debtors to Lender shall prove to have been incorrect or misleading in any material respect or to have failed to disclose a fact, where such omission renders the statement, representation or warranty misleading; or
(4) Debtors shall default in the payment or performance of any part of the DIP Obligations; or

4

(5) Debtors shall breach any covenant, term, condition, restriction, or prohibition contained in any Financing Order or in this Agreement, or in any other existing or future agreement with Lender; or
(6) Debtors or any other Person shall file with any court an appeal, motion or other request seeking the modification, reconsideration, rescission, stay, vacatur, or reversal of any Financing Order or this Agreement; or
(8) Debtors shall file (or any other Person shall obtain a court order approving) (A) a disclosure statement or plan which does not provide for the full, final, and indefeasible repayment of all DIP Obligations upon the effectiveness of such plan, (B) a request for approval of allowance of any Claim or Lien ranking equal or senior to Lender's Claims and Liens under the Financing Orders except as specifically permitted by the Financing Orders, or any motion or adversary proceeding or other pleading that asserts affirmative claims for recovery against the DIP Lender for any reason, or (C) any request for relief from the automatic stay as to any portion of the Collateral; or
(9) any of the Cases shall be dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code; or
(10) the appointment of any one or more of the following for Debtors or for any portion of their assets: (A) a trustee pursuant to Bankruptcy Code §§ 1104(1)(1) or 1104(a)(2); or (B) an examiner with special powers pursuant to Bankruptcy Code § 1104(a); or
(11) The Debtors shall fail to comply with the Budget on a weekly basis as provided in section 2(c) of this Agreement; or
(12) any loss, theft, or destruction of, or damage to, any substantial portion of the Collateral for which there is either no insurance coverage or for which, in the opinion of Lender, there is insufficient insurance coverage; or
(13) any levy, seizure, or attachment upon any Collateral by any third party; or
(14) any Guarantor of the Pre-Petition Obligations shall attempt to terminate his guaranty; or
(15) the Debtors' failure to file with the Court a motion seeking to sell all or substantially all of their assets on or before October 1, 2009; or
(16) Catherine (Rena) Vaughan of Geary Vaughan, LLC, or a successor reasonably acceptable to Sovereign, shall, for any reason, no longer serve as interim manager of or consultant to the Debtors; or
(17) the termination or cessation of all or substantially all of the operations of the Debtors, whether by voluntary act(s) or omission(s) of the Debtors, or otherwise.

"Financing Orders" means the Interim Order (the "Interim Order") granting Debtor's Motion for Emergency Order Authorizing Debtors to Obtain Post-petition Financing and Use Cash Collateral (the "Motion") and the Final Order granting the Motion.

"Guarantors" means, for the purposes of this Agreement, Peter Wojtkun and Steven Guerrette and includes any Debtor to the extent that it has guaranteed obligations of another Debtor.

"Lien" means any lien, charge, mortgage, pledge, assignment, or other encumbrance, retained title, or security interest, whether created or arising voluntarily, involuntarily or by operation of law.

5

"Obligations" is used in its most comprehensive sense and includes all Pre-Petition Obligations as defined in the Pre-Petition Loan Agreements and all DIP Obligations.

"Permitted Prior Liens" means: (1) real estate tax, water and sewer, materialmen's, suppliers' and other like Liens arising in the ordinary course of business and securing obligations that are not yet due and payable or are being contested in good faith by appropriate proceedings, with appropriate reserves therefor on the Debtors' books; and (2) such purchase-money security interests of vendors to Debtors as Lender may approve in writing.

"Person" includes any individual, partnership, joint venture, firm, association, trust, corporation, limited liability company or any other type of association or entity, including the United States, any state, any county, any municipality, and any court, department, agency or instrumentality of any of the foregoing.

"Termination Date" shall mean the earlier of: (i) November 2, 2009; or (ii) any express Termination Date set forth in any Financing Order; or (iii) the date of closing of any sale of all or substantially all of the assets of the Debtors; or (iv) the third business day after an Event of Default as defined herein is continuing after notice of such Event of Default is given by Lender to the U. S. Trustee, counsel to the Debtors, and to any committee appointed in any of the Debtors' Cases ("Committee") and / or counsel to any Committee given by hand, telecopier, email, or other means reasonably intended to provide immediate delivery.

"Uniform Commercial Code" means the Uniform Commercial Code now in effect in the State.

**(b) Interim Order and Final Order.** This Agreement is subject to Bankruptcy Court approval. The Financing Orders are incorporated into this Agreement by reference. In the event of any conflict between any Financing Order and this Agreement, the terms of such Financing Order shall prevail. The Financing Orders shall be in a form acceptable to Lender and its counsel in their sole discretion. The absence of any right, remedy, option, power, privilege, Claim, or Lien from any Interim Order shall not be construed to limit the effect of any right, remedy, option, power, privilege, Claim, or Lien provided for in any Final Order approving this Agreement.

**(c) Miscellaneous.** Capitalized terms not otherwise defined in this Agreement shall have the meanings given them in the Pre-Petition Loan Agreement or the Financing Orders. All terms defined in the Uniform Commercial Code and used without capitalization in this Agreement shall have the same meanings as specified therein, and definitions in Article 9 of the Uniform Commercial Code shall prevail over any definitions in other Articles. The headings in this Agreement are for convenience only and shall not be deemed to be part of this Agreement. Any references to any Person shall be construed in the masculine, feminine or neuter, singular or plural, as the context may re-quire. The terms "includes" and "including" are not limiting.

2. **The DIP Facility – Non-Revolving Loan.**

(a) **Advances.** Subject to the terms and conditions of this Agreement and in the absence of an Event of Default or the occurrence of a Termination Event, Lender agrees to make Advances of up to $191,000.00 in the aggregate. Advances may be requested on a weekly basis in accordance with the Debtors' cash needs as shown in the Budget from the Petition Date through October 10, 2009, in the approximate aggregate amount of $156,000.00. The Budget shall also be deemed to include an additional $35,000.00, the approximate amount of accrued but unpaid wages and payroll taxes for which the Debtors will be liable as of October 10, 2009. Lender may refuse to make advances not in conformity with the Budget. Advances, in the aggregate, shall not exceed the Borrowing Limit of $191,000.00. The DIP Facility is not a revolving facility. Advances once made shall not be remade.

(b) **Manner of Borrowing.** All of the Debtors' requests for Advances shall be irrevocable. Upon Lender's approval of a request for an Advance hereunder, Lender shall credit the amount of the Advance to the general deposit account of Debtors with Lender in immediately available funds. Prior to or concurrently with the execution hereof, Debtors shall certify to Lender the officer or officers of Debtors or representative of Geary Vaughn, LLC, the Debtors' consulting firm, authorized to request Advances, together with true signatures of such officer or officers and Lender may conclusively rely on such certification until it shall receive notice in writing to the contrary.

(c) **Use of Proceeds and Cash Collateral and Certain Management Issues.** On a weekly basis, the Debtors shall use the Advances and Cash Collateral in a manner and in amounts which conform to the Budget and each Wednesday, Debtors' compliance with the Budget for the week ending the immediately preceding Friday shall be tested as follows: (1) actual total disbursements must not exceed the budgeted amount by more than 5% on a cumulative basis; (2) actual total receipts must be at least 85% of the budgeted amount on a cumulative basis. Notwithstanding the foregoing, in the event that actual receipts for any time period exceed budgeted receipts for the same time period, then actual expenses for that same time period may exceed budgeted expenses for that same time period by the amount of such excess actual receipts. Lender may refuse to make advances not in conformity with the Budget. The Debtors shall maintain their debtor in possession bank accounts, including their primary operating account (the "Account") at Sovereign. Catherine (Rena) Vaughan of Geary Vaughn, LLC shall have check signing authority and shall personally approve all expenditures by the Debtors under the Budget. Catherine (Rena) Vaughan shall also be authorized to serve as an interim manager of the Debtors in such capacities and over such business operations as the Debtors' management may direct. The Debtors, subject to bankruptcy court approval, shall retain a golf course broker as soon as practicable but in no event later than ten days after the Petition Date.

(d) **The DIP Facility Account.** Lender shall enter as debits to the DIP Facility Account all Advances, interest, charges, expenses, and other items chargeable to Debtors under

7

any Financing Order or this Agreement, and shall enter as credits to the DIP Facility Account all payments made by Debtors on account of the DIP Facility Account, all net proceeds of Collateral that are finally paid to Lender in cash or solvent credits, and other appropriate debits and credits. The debit balance of the DIP Facility Account shall reflect the amount of indebtedness of Debtors to Lender from time to time by reason of Advances and other appropriate charges under this Agreement.

**(e) Interest.** Interest shall accrue on the outstanding daily debit balance of the DIP Facility Account at the Borrowing Rate. Until the occurrence of a Termination Date, interest on the debit balance of the DIP Facility Account shall be paid in arrears on the first day of each calendar month and all accrued interest shall be paid in full upon any Termination Date. After a Termination Date, at Lender's option, interest shall accrue on the debit balance of the DIP Facility Account at a rate equal to the lesser of (a) the Borrowing Rate plus four percent (4.00%), or (b) the maximum rate permitted by law, and such interest shall be due and payable, on demand, at such rate until the entire amount due is paid to Lender, whether or not any action shall have been taken or proceeding commenced to recover the same or to foreclose any collateral. If, at any time, the rate of interest shall be deemed by any court of competent jurisdiction to exceed the maximum rate of interest permitted by applicable laws, then, during such time as such rate of interest would be deemed excessive, that portion of each interest payment attributable to that portion of such interest rate that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal.

**(f) Origination Fee.** Debtors shall pay to Lender from the first Advance upon entry of the Interim Order hereunder a non-refundable origination fee of $5,000.00.

**(g) Repayment and Maturity Date.** On November 2, 2009 or any earlier occurring Termination Date, the Debtors shall immediately pay the DIP Obligations in full. Prior to November 2, 2009 or any earlier occurring Termination Date, the Debtors shall make the following payments to Lender:

(1) Under the DIP Facility:
In addition to the Origination Fee, Debtors shall pay on the first day of each calendar month all accrued interest in arrears on the DIP Facility as provided in subsection (e) above.

(2) As adequate protection for the Debtors' use of Sovereign's Pre-Petition Collateral, the Debtors shall have paid or shall pay under the Swap Agreement and Revolving Term Note the following amounts at the following times:

Under the Swap Agreement:
On September 26, 2009 - $16,000.00

Under the Revolving Term Note:
On September 12, 2009 - $1,000.00
On September 26, 2009 - $1,000.00

8

**(h) Proceeds.** All proceeds of Collateral shall be deposited by Debtors directly with Lender in the accounts maintained by Debtors with Lender.

**(i) Notes to Evidence Advances.** At any time and from time to time upon request of Lender, Debtors shall execute and deliver to Lender promissory notes or other documents or instruments evidencing any or all of the DIP Obligations, in form and substance satisfactory to Lender.

**(j) Effect of Termination of Lender's Commitment.** Termination of Lender's Commitment shall not affect Debtor's duties under the Financing Orders, this Agreement, or applicable law. Despite such termination, Lender shall retain the Liens and other rights, remedies, powers, and privileges under the Financing Orders, this Agreement, and applicable law until full, final and indefeasible payment and performance of all DIP Obligations.

3. **Grant of Lien, Superpriority and Affirmations and Carve Out.**

(a) The Debtors acknowledge and confirm their joint and several liability for the DIP Obligations and that the DIP Obligations shall have superpriority expense of administration status in the Cases and Lender shall also have a claim under 11 U.S.C. §507(b) for any diminution in value of the Pre-Petition Collateral. To secure the payment and performance of the DIP Obligations and to secure Lender's interest in the Pre-Petition Collateral against diminution in value for any reason, Debtors hereby pledge, assign, and transfer to Lender and grant to Lender a continuing paramount and first priority priming, unavoidable, automatically perfected Lien in and on all of the Collateral (collectively, the "DIP Liens" and Adequate Protection Liens"). Notwithstanding the foregoing, the DIP Liens and Adequate Protection Liens shall not encumber Avoidance Actions.

(b) The Debtors hereby confirm and acknowledge that: (a) the Pre-Petition Loan Agreements are enforceable in accordance with their terms and the Pre-Petition Liens in the Pre-Petition Collateral are valid, binding, enforceable, non-avoidable, and perfected and secure all of the Pre-Petition Obligations in the amounts described in any Financing Order, (b) the Pre-Petition Liens had priority over any and all other liens on the Pre-Petition Collateral, subject only to Permitted Prior Liens to the extent that any such Permitted Prior Liens were valid, properly perfected, non-avoidable, and senior in priority to the Pre-Petition Liens as of the Petition Date; (c) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable (except to the extent that enforcement is stayed by section 362 of the Bankruptcy Code) in accordance with the terms of the Pre-Petition Loan Agreements in the amounts set forth in the Interim Order; and (d) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Pre-Petition Liens or the Pre-Petition Obligations exist, and no portion of the Pre-Petition Liens or the Pre-Petition Obligations is subject to any challenge or defense, including, without limitation, postponement of payment, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(c) Lender's Liens and superpriority claims granted hereunder shall be subordinate in priority only to the following claims and liens: (i) claims payable or allowed under the Carve Out, as defined below; (ii) the Debtors' right, upon the occurrence of an Interim Order Termination Date or any other Termination Date, to use any Cash Collateral and any other funds then on deposit in the Debtors' bank accounts maintained at Sovereign, exclusive of the Carve Out Account defined below, solely to pay all accrued but unpaid payroll and payroll taxes of the Debtors for the previous two week period in an amount not to exceed $70,000.00 (the "Final Payroll Right'); and (iii) claims secured by Permitted Prior Liens, as defined herein. The term "Carve Out" shall mean and include solely the following claims: (A) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); and (B) fees and expenses of Debtors' counsel Duane Morris, LLP that have accrued, or will accrue, on account of or in connection with the Debtors' bankruptcy cases, up to an amount of $50,000.00 (exclusive of any and all amounts already paid to Duane Morris, LLP), and fees and expenses of Debtors' financial consultant, Geary Vaughan, LLC up to an amount of $30,000.00 (exclusive of any and all amounts already paid to Geary Vaughan, LLC), which amounts are budgeted to be paid to said professionals during the time period covered by the Budget, but only to the extent that: (i) such fees and expenses are allowed by the Court; and (ii) there are insufficient unencumbered assets in the Debtors' estates or funds held as retainers by such professionals to pay such fees and expenses. To the extent that the Court allows the Debtors to pay fees and expenses directly to such professionals on a weekly basis in accordance with the Budget, such payments shall be credited against and reduce the Carve Out. In the absence of such payments directly to such professionals, the Debtors shall maintain a separate bank account at Sovereign into which they shall deposit on a weekly basis only the amounts set forth in the Budget necessary to pay such fees and expenses and to fund the Carve Out (the "Carve Out Account") and such bank account shall be deemed encumbered solely by liens in favor of said professionals and Sovereign securing payment of, in the following order of priority: (i) the Carve Out; (ii) the DIP Obligations; and (iii) the Pre-Petition Obligations.

4. **Conditions Precedent to Initial and Subsequent Advances.**

(a) **Initial Advance.** The obligation of Lender to make the initial Advance under this Agreement is subject to the following conditions precedent:
(1) Lender shall have received:
(A) this Agreement, duly executed by Debtors and Lender;
(B) the Budget, in form and substance satisfactory to Lender;
(C) a certified copy of all corporate action taken by Debtors to authorize the execution, delivery, and performance of the Interim Order and this Agreement and the borrowing by it under this Agreement, a certificate identifying the officer or officers authorized to make requests for Advances under this Agreement, and such other papers as Lender shall reasonably require;
(D) such financial and other credit information and documentation on Debtors and each Guarantor as Lender shall require.
(2) The Court shall have entered the Interim Order on or before September 15, 2009.

(3) DIP Liens shall not be subject to any other Claim or Lien, except as expressly permitted by this Agreement or the Interim Order.
(4) No Event of Default shall have occurred and be continuing.

**(b) All Advances.** The obligation of Lender to make each Advance to be made by it under this Agreement (including the initial Advance) is subject to the following conditions precedent:
(1) All of the conditions in the preceding subsection of this Agreement remain satisfied.
(2) All instruments and agreements referred to therein remain in full force and effect.
(3) No Event of Default shall have occurred and be continuing and no Termination Date shall have occurred.
(4) The representations and warranties of Debtors in the Financing Orders and this Agreement shall be true on and as of the date of the making of such Advance with the same force and effect as if made on and as of such date.
(5) No Financing Order shall not have been amended, rescinded, stayed, vacated, reversed, or modified in any respect.
(6) All legal matters incident to the transactions hereby contemplated shall be satisfactory to Lender.
(7) The Debtors' accounts with Lender are the sole bank of accounts of Debtors.

**(c) Conditions for Lender's Benefit.** These conditions precedent exist solely for Lender's benefit, and Lender in its sole discretion shall determine whether they have been satisfied.

5. **Representations and Warranties.**

As a material inducement to Lender to make Advances to Debtors under this Agreement, Debtors represent and warrant to Lender that upon entry of the Interim Order:

(a) the Interim Order, this DIP Loan Agreement, and (subject to other Persons' rights under the Interim Order) the Pre-Petition Loan Agreements are the legal, valid and binding obligations of Debtors, enforceable against the Debtors and any other parties thereto in accordance with their respective terms,
(b) the obligation of Debtors to repay the DIP Obligations is absolute and unconditional,
(c) there exists no right of set-off or recoupment, counterclaim, cross-claim or defense of any nature whatsoever to payment of the DIP Obligations or, subject to other Persons' rights under the Interim Order, the Pre-Petition Obligations, and
(d) the DIP Liens upon the Collateral are valid and perfected first-priority Liens subject only to Permitted Prior Liens, the Carve Out and the Final Payroll Right.
(e) No representation, warranty, or statement by Debtors contained in the Motion, this Agreement, or any certificate or other document furnished or to be furnished by Debtors pursuant to this Agreement contains or at the time of delivery shall contain any untrue statement of material fact, or omits, or shall omit at the time of delivery, a material fact necessary to make it not misleading.

6.     **Covenants and Financial Reporting.**

So long as the Commitment shall be outstanding and until the full, final, and indefeasible payment and performance of all Obligations, Debtors agrees that:

**(a) Reporting Requirements.** Debtors shall furnish Lender:
(i) on or before the time specified therefor in the Pre-Petition Loan Agreements, all financial statements, information, reports, notices and other financial analyses required to be delivered by the Pre-Petition Loan Agreements,
(ii) on the Wednesday following the end of each week, a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the immediately preceding week and since the Petition Date and an accounts receivable aging report,
(iii) such other financial statements, information, and reports as the Pre-Petition Lender shall reasonably request,
(iv) the Debtors shall provide counsel to the Pre-Petition Lender, immediately upon filing with the Court or the office of the United States Trustee, with copies of all monthly operating reports, status reports, pleadings, motions, and other requests or objections filed by the Debtor and copies of any offers to purchase any assets of the Debtors immediately upon their receipt by the Debtors and all such offers shall also be shared immediately with Catherine (Rena) Vaughan.

**(b) Budget Compliance.** Debtors shall comply with the Budget including as required by Section 2 hereof.

**(c) General Covenants with Respect to Collateral.**
(1) Debtors shall keep the Collateral in good order and repair and shall not use the same in violation of law or any policy of insurance thereon.
(2) Debtors shall operate their businesses in compliance with all applicable laws.
(3) Debtors shall notify Lender of any change occurring in or to any Collateral or in any fact or circumstance warranted or represented by Debtors to Lender, or if any Event of Default occurs.

**(d) Perfection and Priority of Lender's Liens.** Debtors shall not create, incur, or suffer any Lien upon any Collateral, except: (1) Lender's Liens, (2) Permitted Prior Liens. Notwithstanding the provision in any Financing Order that DIP Liens shall be automatically perfected, at Lender's option and at Debtors' expense, Debtors shall execute, acknowledge, deliver, record, register, and file such agreements and other records (including financing statements, mortgages, and deeds of trust) as Lender may specify.

**(e) Books and Records and Inspection of Collateral.** Debtors shall keep accurate books and records and shall permit Lender and/or its agents and representatives and any golf club management companies retained by Lender, at any reasonable time and from time to time, to enter Debtors' places of business and inspect and appraise any Collateral, examine any of Debtors' books and records, make copies or extracts from such books and

records, and discuss Debtors' assets and affairs with Debtors and their accountants and other advisors and to inspect and analyze the golf club operations of the Debtors.

**(f) Insurance.** The Debtors will continue to comply with their obligations regarding insurance as set forth in the Pre-Petition Loan Agreements.

**7.     Rights and Remedies After an Event of Default or Termination Date.**

Upon the occurrence of any Event of Default, Lender may immediately cease making Advances pending a further determination of whether the Lender's commitment under this Agreement is permanently terminated. Notwithstanding the foregoing, the Lender shall fund the Carve Out through any Termination Date and allow the Debtors to exercise the Final Payroll Right subject to the limitations on amounts and conditions set forth herein. Upon the occurrence of any Termination Date, Lender may do any one or more of the following:
(a) by notice to Debtors, declare the Commitment to be terminated, whereupon the Commitment shall terminate;
(b) by notice to Debtors, declare all Obligations to be forthwith due and payable, whereupon same shall become forthwith due and payable, without presentment, notice of dishonor, protest, or further notice of any kind, all of which Debtors hereby waive;
(c) take any action Debtors are required to take or which is otherwise necessary or appropriate to perform all or any part of the Obligations, without notice to Debtors, and add costs of same to the Obligations, which shall be payable on demand and shall accrue interest at the default rate allowed hereunder;
(d) take possession of the Collateral, and for that purpose Lender may, so far as Debtors can give authority therefor, enter upon and/or remain upon any premises on which the Collateral may be situated and sell, liquidate or collect Collateral on the premises or remove same therefrom;
(e) set off, without notice to Debtors, any and all deposit accounts, deposits or other sums at any time or times credited by or due from Lender to Debtors, whether in a special account or other account or represented by a certificate of deposit (whether or not matured), at any time against first the DIP Obligations and then the Pre-Petition Obligations in such manner as Lender determines in its sole discretion whether or not they are then due and whether other security held by Lender is deemed by it to be adequate, provided, that such right of set off shall be subject to the Final Payroll Right;
(f) require Debtors to assemble any or all Collateral at such location or locations as Lender may designate;
(g) sell, pledge, foreclose any mortgage on, assign, demand, sue for, collect, compromise payment or performance of, or make any other agreement with respect to any Collateral in Debtor's or Lender's name, make any other disposition of any Collateral, which disposition may be for cash, credit or any combination thereof, and Lender may purchase any Collateral at public or (if permitted by law) private sale, and in lieu of actual payment of any purchase price, may set off the amount of the price against the Obligations;
(h) notify the post office authorities to change the address for delivery of mail of Debtors to an address designated by Lender and receive, open, and dispose of all mail addressed to Debtors; and/or

(i) without limiting any of the foregoing, exercise any or all of the rights and remedies available to it under the Financing Orders, this Agreement, or applicable law, including any and all of the default rights and remedies available to a secured party under the Uniform Commercial Code or Massachusetts law as it applies to foreclosure of real estate mortgages.

**8. Expenses Incurred by Lender.**

In its discretion, Lender may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto, pay any necessary filing fees, and take any action Debtors are required to take under this Agreement, and add costs of any of the foregoing to the DIP Facility Account. Debtors shall reimburse Lender on demand for any and all costs or expenses Lender may incur.

**9. Remedies Cumulative and for Lender's Benefit Only.**

All rights, remedies, powers, and privileges of Lender under the Financing Orders, this Agreement, or applicable law shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Lender deems expedient. Such rights, remedies, powers, and privileges are solely to protect Lender's interests and shall not impose any duty upon Lender to exercise any such powers.

**10. Debtors' Consents and Waivers.**

Except as otherwise specifically set forth in this Agreement or any Financing Order, Debtors hereby irrevocably:
(a) with respect to both the Obligations and the Collateral, assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any Person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Lender may deem advisable;
(b) waives any and all suretyship defenses;
(c) waives the right to invoke any law relating to marshaling, moratorium, or stay, which might delay or impede the enforcement of Lender's rights, remedies, powers, or privileges under the Financing Orders, this Agreement, or applicable law; and
(d) waives all rights and remedies under Bankruptcy Code section 506(c) with respect to the DIP Obligations.

**11. General Provisions**

(a) Notices. Except as may be otherwise expressly provided herein, any demand or notice required or permitted to be given under this Agreement shall be deemed effective when deposited in the United States mail, and sent by certified mail, return receipt requested, postage prepaid, addressed to Lender or to Debtors at their respective address in this

Agreement, or to such other address as either party shall designate for itself in writing to the other party.

(b) Reservation of Lender's Rights. Notwithstanding any course of dealing or course of performance: (1) neither failure nor delay on the part of Lender to exercise any right, power, or privilege under any Financing Order, this Agreement, or any applicable law shall operate as a waiver thereof; (2) no single or partial exercise of any right, power, or privilege under any Financing Order, this Agreement, or any applicable law shall preclude any other or further exercise thereof or the exercise of any other right, power, or privilege; (3) no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Lender; and (4) Lender's approval or consent shall not be effective unless such approval or consent shall be specific and in writing, and no approval or consent shall be implied from any other action, inaction, statement, or acquiescence of Lender.

(c) Counterparts; Facsimile Signatures. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

(d) Severability. If any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

(e) Governing Law. The Financing Orders and the DIP Financing Documents shall be governed by and construed in accordance with the internal substantive laws of the Commonwealth of Massachusetts, without regard to the choice of law principles of the Commonwealth of Massachusetts. This Agreement is subject to approval of the Bankruptcy Court and the Bankruptcy Court shall have jurisdiction over any disputes regarding this Agreement.

(f) Lender's Fees and Expenses. Debtors shall pay, whether or not any Advance is made under this Agreement, all costs, expenses and fees (including appraisals, audits, and reasonable counsel fees) incurred by Lender: (1) in connection with the preparation, execution, and delivery of the Financing Orders and this Agreement and the making of Advances under this Agreement; (2) costs of collection in case of any Event of Default; (3) incident to the enforcement of payment of any part of the Obligations by any action or participation in, or in connection with, a case or proceeding under any Chapter of the Bankruptcy Code, or any successor statute thereto. Notwithstanding the above, payment by the Debtors of Lender's attorneys' fees and expenses incurred in connection with the Debtors shall be subject to Bankruptcy Court approval.

(g) Complete Agreement. This Agreement and the Interim Order constitute the entire agreement and understanding among the parties relating to the subject matter of this

Agreement, and supersede all prior proposals, negotiations, agreements and understandings relating to such subject matter. In entering into this Agreement, Debtors acknowledge that they are relying on no statement, representation, warranty, covenant or agreement of any kind made by the Lender or any employee or agent of the Lender, except for the agreements of Lender set forth in this Agreement.

(h) Waiver of Jury Trial and Right to Certain Damages. **Debtors and Lender waive their right to a jury trial against all Persons with respect to any action or Claim arising out of any dispute in connection with this Agreement, any rights or obligations under this Agreement or the performance of any such rights or obligations.** Except as prohibited by law, Debtors also waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed, all as of the day and year written above.

Sovereign Bank
By: _____
Name: Bret Bokelkamp
Title: Vice President

Georgetown Golf Club, Inc.
By: _____
Name: Peter Wojtkun
Title: President

Georgetown Links, LLC
By: _____
Name: Peter Wojtkun
Title: Manager

New England Golf Partners, Inc.
By: _____
Name: Peter Wojtkun
Title: President

16